IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IQVIA, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:18-CV-328 |
| NORTHGATEARINSO, INC., | § § § | |
| Defendant. | § § § | |

## VERIFIED COMPLAINT

Plaintiff IQVIA, Inc. ("IQVIA"), by its counsel Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, and Pillsbury Winthrop Shaw Pittman LLP, files this action against Defendant NorthgateArinso, Inc. ("NGA") (together, the "Parties"), asserting claims for a declaratory judgment, breach of contract, and immediate and permanent injunctive relief, and in support thereof alleges as follows:

## NATURE OF THE ACTION[1]

1. IQVIA brings this action, on an emergency basis, to protect the payroll checks and direct deposits of more than 13,000 IQVIA employees, over 3,000 of whom live and work in and around Durham County.

2. The immediate injunctive relief IQVIA seeks is crucial to prevent Defendant, the payroll processor for those 13,000+ employees, from carrying through on its stated threat to now completely cease processing IQVIA employees' paychecks and direct

---

[1] This Complaint is verified pursuant to the Declaration of Michael McDonnell, filed contemporaneously herewith. To avoid duplicative submissions, we cross-reference herein the exhibits included in the simultaneously filed Declaration. Unless otherwise noted, all emphasis in this Complaint has been added.

deposits, on just 30 days' advance notice to IQVIA. Unless now enjoined, Defendant intends, upon information and belief, to deny those IQVIA employees their paychecks and direct deposits following expiration of that 30-day notice period.

3. The Parties' underlying dispute here arises out of their Global Master Services Agreement for payroll outsourcing, executed July 29, 2016 (the "Agreement"). Even though IQVIA has already enrolled over 13,000 employees for payroll processing under that Agreement, and has already paid Defendant over $3 million for those payroll services, Defendant nonetheless contends it is free to walk away from the Parties' contract because the number of employees IQVIA has thus far enrolled is substantially fewer than Defendant expected.

4. As detailed below, however, the Parties' Agreement affords Defendant no such walk-away right. Nor does it give Defendant the right to demand the $2,694,753 penalty payment Defendant is insisting IQVIA now make for Defendant to continue servicing those employees.

5. While this Court carefully sorts out the Parties' respective contract rights and obligations here, however, one thing is crystal clear: 13,000+ IQVIA employees cannot be held hostage by Defendant nor, more particularly, should they be threatened with the prospect of losing their payroll checks and direct deposits. The <u>status quo</u> must be preserved; the timely processing of payroll checks and direct deposits must continue; and these innocent victims must all be protected.

2

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA   Document 1   Filed 04/23/18   Page 2 of 19

deposits, on just 30 days' advance notice to IQVIA. Unless now enjoined, Defendant intends, upon information and belief, to deny those IQVIA employees their paychecks and direct deposits following expiration of that 30-day notice period.

3. The Parties' underlying dispute here arises out of their Global Master Services Agreement for payroll outsourcing, executed July 29, 2016 (the "Agreement"). Even though IQVIA has already enrolled over 13,000 employees for payroll processing under that Agreement, and has already paid Defendant over $3 million for those payroll services, Defendant nonetheless contends it is free to walk away from the Parties' contract because the number of employees IQVIA has thus far enrolled is substantially fewer than Defendant expected.

4. As detailed below, however, the Parties' Agreement affords Defendant no such walk-away right. Nor does it give Defendant the right to demand the $2,694,753 penalty payment Defendant is insisting IQVIA now make for Defendant to continue servicing those employees.

5. While this Court carefully sorts out the Parties' respective contract rights and obligations here, however, one thing is crystal clear: 13,000+ IQVIA employees cannot be held hostage by Defendant nor, more particularly, should they be threatened with the prospect of losing their payroll checks and direct deposits. The <u>status quo</u> must be preserved; the timely processing of payroll checks and direct deposits must continue; and these innocent victims must all be protected.

## PARTIES

6. Plaintiff IQVIA is a multinational company that provides solutions focused on helping healthcare clients find better solutions for patients. IQVIA, which is incorporated in Delaware, has a significant place of business in Durham County, North Carolina, and employs over 3,000 local residents.

7. IQVIA is the product of a 2016 merger between two formerly independent companies, IMS Health ("IMS") and Quintiles Transnational ("Quintiles").

8. Defendant NGA provides managed payroll and tax filing solutions to IQVIA and other companies. Upon information and belief, NGA is incorporated in Georgia, and has its principal United States place of business in Jacksonville, Florida.

## JURISDICTION AND VENUE

9. This Court has diversity-based subject matter jurisdiction over IQVIA's claims pursuant to 28 U.S.C. §§ 1332, because this is a dispute between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. The Court may exercise personal jurisdiction over NGA because (i) NGA entered into the Agreement with Quintiles, a North Carolina citizen, which directly effects over 3,000 North Carolina residents now employed by IQVIA, thereby purposefully establishing significant contact with the forum state; and (ii) IQVIA's causes of action arise out of that Agreement.

11. Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the causes of action occurred in this District.

## FACTUAL BACKGROUND

**A. The Parties' Global Master Services Agreement**

*(1) The Parties Enter the Agreement*

12. In 2015, Quintiles began exploring the idea of outsourcing its global payroll functions to a third-party vendor.

13. Defendant NGA, one of the world's largest payroll service providers, emerged as a top contender in Quintiles' highly competitive bidding process.

14. On July 29, 2016, NGA and Quintiles entered into the Agreement, providing for the transition to, and performance of, Quintiles' payroll Services by NGA. *See* Ex. 1.

*(2) The Phased Transition of Payroll Services*

15. The Agreement contemplated the transition of Quintiles' payroll activities to NGA in six separate "waves" across the different geographic areas in which Quintiles employees are based. More specifically:

- (a) the Parties anticipated that "Wave 1" would be completed (or "go live") by April 2017, and would cover Denmark, Norway, Sweden, Ireland, and the United Kingdom.

- (b) "Wave 2" was anticipated to be completed by July 2017, and would cover the United States.

- (c) Waves 3 through 6 would then cover the remaining regions in which Quintiles had operations – the rest of Europe, the Middle East/Africa, Asia-

> Pacific, Canada, and Latin America. Waves 3-6 were expected to be completed by October 2017, January 2018, April 2018, and July 2018, respectively.

*See generally id.* at Attachment 4-7 to Schedule 4.

16. The entire payroll processing transition was ultimately expected to cover payroll processing for more than 36,000 employees worldwide. The Parties used a phased approach to this outsourcing transition to ensure the effective and efficient management of resources and the project in general.

*(3) Payment Computation*

17. Schedule 4 of the Agreement, entitled "Charges," set forth the mechanism for calculating the payments that would be due NGA for its Services. *See id.* at §19.1, Schedule 4. Schedule 4 set a baseline volume of employees, and a baseline charge, for each country covered by the Agreement. *See id.* at Schedule 4, Attachment 4.1.

18. If, at any point, "the actual number of Chargeable Employees during a month is more or less than the associated Baseline Volume," the "Monthly Base Charges [would be] subject to adjustment (upward or downward, as applicable)" according to a formula set forth in the schedule. *Id.* at Schedule 4 at §3.2(a), (c).

19. If the number of Chargeable Employees for a particular jurisdiction was more than 25% higher, or more than 25% lower, than the anticipated Baseline Volume, however, the Parties would then be obligated to "negotiate an appropriate adjustment of the Baseline Volume, Base Charge," using adjustment rates "to better reflect the underlying costs and/or economies of scale." *Id.* at Schedule 4 at §3.2(f).

5

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA   Document 1   Filed 04/23/18   Page 5 of 19

20.     The Agreement thus contained a specific mechanism designed to protect the Parties if they suddenly found themselves with payroll processing that covered significantly more, or significantly fewer, employees than originally anticipated at the time of contracting.  That adjustment mechanism made it clear that any change of more than 25% in the actual number of employees covered by the Agreement in a particular country – either upwards or downwards – would not give rise to a right of contract termination, but rather to a renegotiation of the pricing for that particular country.

21.     NGA was responsible under the Agreement for tracking, and reporting to IQVIA, the actual number of Chargeable Employees, on a monthly basis, in each country.  Any corresponding changes would then be applied to the following month's invoice.  *Id.* at Schedule 4 at §3.2(c)(ii).

22.     In the event IQVIA objected to any such NGA invoice then, within 30 days of receipt, IQVIA had to "deliver notice (a "Payment Dispute Notice") to NGA specifying the Disputed Amount."  The Parties would then "work together in good faith to resolve Disputed Amounts in accordance with Section 27.3 [*sic*]."[2]  *Id.* at §19.3; *see also* Schedule 4 at §8.2 (setting forth procedure for dealing with disputed invoices).

23.     Section 27.2 of the Agreement, in turn, obligated the Parties to:

> [U]se reasonable efforts to resolve any claim, problem or dispute (collectively, a "Dispute") that may arise out of or relate to this Agreement or any breach thereof by first escalating through the hierarchy of the committees, as set forth in Schedule 8 (Governance and Personnel).  Such committees shall meet and use their respective reasonable

---

[2] The Agreement does not, in fact, contain a Section 27.3.  Upon information and belief, the Parties intended this cross-reference to point instead to Section 27.2.

6

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA   Document 1   Filed 04/23/18   Page 6 of 19

efforts to resolve the Dispute. The Parties may resort to a mutually agreed formal dispute resolution process to resolve any Dispute that is not resolved in accordance with the foregoing.

*Id.* at §27.2.

*(4) The "Change Control" Procedures under the Agreement*

24. The Agreement further provided that, "[f]rom time to time, Customer or NGA may request New Services, a Project, or that NGA implement a Change to the Services." Ex. 1 at §5.1. Should either party make such a request, the Parties agreed to "use the Change Control Procedures set forth in Schedule 9 . . . to agree to the terms upon which New Services, Projects and Changes will be provided by NGA." *Id.*; *see also id.* at Schedule 4 at §1.3(a) ("[t]he Parties will negotiate in good faith to agree upon Changes to the Agreement . . . .").

25. Schedule 9, in turn, provided in relevant part, that:

> Following a Customer's request for a Change or Project, Customer may either (i) request that NGA provide a rough order of magnitude of the work effort, or (ii) in lieu of the estimate, request to move directly to the business requirements gathering phase whereby NGA and Customer will work together to identify the business requirements in an iterative fashion and with as much detail as possible. NGA will submit the final business requirements to Customer in writing and Customer will approve or reject the business requirements in writing as soon as reasonably possible but in any event within five (5) Business Days of its submission by NGA. Once approved, NGA will prepare a Change Order substantially in accordance with the form set forth in Attachment 9A to this Schedule 9 . . . for the proposed Change or Project."

*Id.* at Schedule 9 at §2.2(a).

26. Consistent with the foregoing, the Parties expressly agreed that, in the event either party requested a change affecting the number of countries covered by the Agreement, these same Change Control Procedures would apply. *See id.* at Schedule 4 at §11 (the Parties agree to "use the Change Control Procedures to add or remove countries from scope").

*(5) Assistance with Third-Party Vendors*

27. The Parties also fully anticipated that, over time, IQVIA might need to rely on other third-party human resource and technology vendors in addition to NGA.

28. Accordingly, the Parties agreed that, if IQVIA were to engage "a Third Party . . . to perform information human resources, technology or other services related to the Services (the "Third Party Services"), NGA [would] provide Customer and the Third Party with reasonable cooperation and assistance requested by Customer in connection with the provision of the Third Party Services . . . ." *Id.* at §10.1.

*(6) Termination Rights*

29. In Section 22 of the Agreement, the Parties laid out their respective contract termination rights. Specifically, Section 22.1 provided, in relevant part that, in the event of a material breach, "either Party may at its option terminate this Agreement by notifying the other Party" if that breach "is not cured within 30 days after the other Party has given the Defaulting Party Notice specifying the default in reasonable detail (a 'Material Breach')." *Id.* at §22.1(a)(2).

30. Section 22.5 then clarified, in no uncertain terms, that, "[e]xcept for a suspension of Services under section 19.3 for Quintiles' non-payment of Charges under

8

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA   Document 1   Filed 04/23/18   Page 8 of 19

26. Consistent with the foregoing, the Parties expressly agreed that, in the event either party requested a change affecting the number of countries covered by the Agreement, these same Change Control Procedures would apply. *See id.* at Schedule 4 at §11 (the Parties agree to "use the Change Control Procedures to add or remove countries from scope").

*(5) Assistance with Third-Party Vendors*

27. The Parties also fully anticipated that, over time, IQVIA might need to rely on other third-party human resource and technology vendors in addition to NGA.

28. Accordingly, the Parties agreed that, if IQVIA were to engage "a Third Party . . . to perform information human resources, technology or other services related to the Services (the "Third Party Services"), NGA [would] provide Customer and the Third Party with reasonable cooperation and assistance requested by Customer in connection with the provision of the Third Party Services . . . ." *Id.* at §10.1.

*(6) Termination Rights*

29. In Section 22 of the Agreement, the Parties laid out their respective contract termination rights. Specifically, Section 22.1 provided, in relevant part that, in the event of a material breach, "either Party may at its option terminate this Agreement by notifying the other Party" if that breach "is not cured within 30 days after the other Party has given the Defaulting Party Notice specifying the default in reasonable detail (a 'Material Breach')." *Id.* at §22.1(a)(2).

30. Section 22.5 then clarified, in no uncertain terms, that, "[e]xcept for a suspension of Services under section 19.3 for Quintiles' non-payment of Charges under

8

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA   Document 1   Filed 04/23/18   Page 8 of 19

Section 19.3 [governing non-payment of undisputed invoices], **NGA will not, in any event, discontinue any Services until such time as Customer notifies NGA that Customer has established appropriate alternatives to such Services**." *Id.* at §22.5.

B. <u>The Quintiles/IMS Merger and the Resulting Change in the Scope of the Agreement</u>

31. On October 3, 2016, Quintiles signed a merger agreement with IMS to form QuintilesIMS.

32. QuintilesIMS thereafter changed its name to IQVIA, effective November 6, 2017.

33. At the time of the merger, IMS, like Quintiles, had already outsourced payroll responsibilities for some of its international employees. In the United States, however, IMS was performing those payroll responsibilities itself.

34. As a result of these differing approaches to payroll, IQVIA was required following the Quintiles-IMS merger to integrate multiple different payroll systems (in addition to many other integration activities, including integration of multiple financial systems and human resources systems).

35. IQVIA decided to continue rolling out Waves 1 and 2 under the Agreement, and to transition to NGA the entire IQVIA payroll system for the 13,000+ employees in the six countries covered by those first two waves.

36. That full implementation of Waves 1 and 2 meant that approximately 36% of the employee population originally envisioned in the Agreement would still be

processed by NGA – *i.e.*, more than 13,000 out of the 36,000+ employees originally envisioned.

37. IQVIA has, to date, already paid NGA over $3 million – the full amount for which it was invoiced – for the payroll Services provided in the six Wave 1 and 2 countries.

38. IQVIA promptly notified NGA of its decision to suspend implementation of Waves 3 to 6 of the Agreement, in light of the integration issues presented by the Quintiles-IMS merger. IQVIA did so before NGA started work on those waves, in order to make certain that NGA would avoid expenses for Waves 3 to 6, and could redeploy those resources to other business opportunities.

39. Consistent with the foregoing, and in compliance with Section 5.1 and Schedules 4 and 9 of the Agreement, on March 22, 2017, IQVIA provided NGA with a formal contract Change Order, requesting the deletion of "all Services, including Transition Services, and Deliverables for countries in Waves 3 through 6 from the Agreement" (the "Change Order"). Ex. 2. That Change Order made it clear that those changes did "not affect Services and Deliverables for countries in Waves 1 and 2, which will continue under the Agreement." *Id.*

40. In connection with that Change Order, IQVIA also stated it was prepared to pay for any incremental costs already incurred by NGA in connection with preparing to provide Wave 3-6 Services.

41. In a conversation on or about May 26, 2017, Daniel Stanovich, NGA's Vice President, Service Delivery, confirmed to Steve Kirk, IQVIA's Chief Procurement Officer,

10

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA   Document 1   Filed 04/23/18   Page 10 of 19

that NGA had not yet commenced work on Waves 3 through 6, and therefore had not incurred, and would not incur, any incremental costs as a result of the reduction in the scope of the Agreement.

42. On or about June 26, 2017, Mr. Stanovich again reiterated that the change in contract scope had not caused NGA to incur any incremental costs.

43. Notwithstanding Mr. Stanovich's May 26 and June 26 admissions, however, on July 13, 2017, NGA invoiced IQVIA for $2,694,753, purportedly pursuant to Section 22.2 of the Agreement, claiming that such a penalty payment was now due because IQVIA had triggered a full-blown contract "[t]ermination of [c]onvenience." *See* Ex. 3 (Invoice No. 96063197) (the "7/13/2017 Invoice").

44. Under Section 19.3 of the Agreement, IQVIA had 30 days to challenge NGA's 7/13/17 Invoice. On August 11, 2017, Steve Kirk, IQVIA's Chief Procurement Officer, timely did so. Mr. Kirk emailed Mark Squiers, a Senior Vice President at NGA, stating that IQVIA did "not recognize any contractual basis for the invoice," and was "truly surprised at NGA's insistence that it has a right to claim early termination fees, particularly since [IQVIA] did not terminate the contract." Mr. Kirk further stated that IQVIA did "not consider it appropriate to seek payment for services that have not been performed and are no longer under contract." Ex. 4.

(d) *The WorkDay Project*

45. On multiple occasions, and fully in accordance with Section 10.1 of the Agreement, IQVIA requested NGA's assistance in establishing connections between NGA's payroll system and IQVIA's new human resources information system, called

11

4849-9613-4242

Case 1:18-cv-00328-CCE-LPA Document 1 Filed 04/23/18 Page 11 of 19

WorkDay. Those connections necessitated the development of a new interface between the WorkDay system and NGA's payroll system (the "WorkDay Project"), intended to be effective by April 1, 2018.

46. NGA and IQVIA representatives discussed the requirements associated with the WorkDay Project for many months, reaching agreement on scope, fees and timing associated with the work to be performed by NGA.

47. But on December 19, 2017, Kenneth Hopkin's, NGA's Global Account Director, emailed IQVIA, advising that "NGA have [*sic*] made the decision to stop CR work including the Workday Project," notwithstanding that he "recognize[d] this will cause challenges with the project." Ex. 5.

48. On December 22, 2017, NGA's CEO confirmed that NGA was refusing to assist IQVIA with the WorkDay Project, thereby deliberately breaching NGA's contractual obligation to provide IQVIA "reasonable cooperation and assistance requested by Customer in connection with the provision of the Third Party Services" under Section 10.1 of the Agreement.

C. **NGA's Other Service Defaults**

49. NGA has, on multiple occasions, also failed to comply with numerous other obligations under the Agreement. For example, NGA has been responsible for serious pension configuration issues, payroll input issues (e.g., maternity payment, child care voucher), payroll output issues (e.g., bank files and benefit files), systems issues, and incorrect processing of thousands of W-2 forms for the 2017 tax year.

50. NGA has also failed to perform governance and administrative activities specified in the Agreement -- or to agree on a plan for resolving these issues.

51. Despite repeated IQVIA communications regarding these NGA service failures, many such issues have still not been resolved. Even when such resolutions have occurred, they occured only after unreasonable amounts of communications from IQVIA and unreasonable delays by NGA. These service issues have therefore required substantial additional work by IQVIA employees and contractors.

### D. The Parties' Failed Dispute Resolution Efforts

52. Since December 2017, the Parties' legal representatives have engaged in multiple communications aimed at resolving the foregoing disputes. But NGA has still not assisted IQVIA with the WorkDay Project and has refused to withdraw NGA's 7/13/17 Invoice.

53. On January 24, 2018, in accordance with the formal dispute resolution requirements of Section 27.2 of the Agreement – requiring that the Parties escalate any disputes "through the hierarchy of the committees, as set forth in Schedule 8" – IQVIA identified Robert Parks, IQVIA's Senior Vice President, Corporate Controller, as its Executive Sponsor to the Executive Steering Committee.

54. It was not until February 27, 2018 – more than one month later – that NGA designated Stuart Ross, NGA's Chief Financial Officer, as NGA's Executive Sponsor to the Executive Steering Committee.

4849-9613-4242

55. Following the designation of NGA's Chief Financial Officer, IQVIA informed NGA that it would instead designate Michael McDonnell, IQVIA's own Chief Financial Officer, as IQVIA's Executive Sponsor to the Executive Steering Committee.

56. Messrs. McDonnell and Ross thereafter engaged in multiple discussions, but they, too, were unable to resolve the Parties' disputes.

57. The Parties' dispute resolution discussions have now reached an impasse.

58. Throughout the dispute resolution process, IQVIA has repeatedly asked NGA for written assurances that NGA will not suspend, terminate, or otherwise make any material change to the payroll processing Services currently being provided by NGA to IQVIA. NGA has consistently refused to give any such assurances. NGA has instead warned IQVIA that NGA would only provide IQVIA 30 days' advance notice of such a termination.

59. There is no way that IQVIA could replace the payroll Services that NGA currently provides IQVIA on just 30 days' notice. Accordingly, any such termination by NGA would necessarily leave 13,000+ IQVIA employees, including more than 3,000 IQVIA employees in the Durham County area, without their paychecks and direct deposits. That would irreparably harming IQVIA's employees and IQVIA's reputation – if and when NGA unilaterally decides to pull that termination trigger.

## COUNT ONE

### (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §2201)

60. IQVIA incorporates by reference Paragraphs 1 through 59 with the same force and effect as if set forth in full herein.

61. A justiciable controversy exists between the Parties as to whether IQVIA's decision to suspend Waves 3 to 6 of the Agreement constitutes a valid exercise of IQVIA's rights under Section 5.1 and Schedule 9 of the Agreement to request that NGA implement a Change to the Services.

62. Section 5.1 provides that "[f]rom time to time, Customer or NGA may request New Services, a Project, or that NGA implement a Change to the Services." Ex. 1 at §5.1; *see also id.* at Schedule 4 at §11 (the Parties agree to "use the Change Control Procedures to add or remove countries from scope"); Schedule 4 at §1.3(a) ("the Parties will negotiate in good faith to agree upon Changes to the Agreement . . . .").

63. On March 22, 2017, IQVIA provided NGA with such a formal Change Order, requesting the deletion of all Services for countries in Waves 3 through 6 of the Agreement.

64. NGA has refused to comply with that Change Order, however, contending that IQVIA's request instead constitutes a "Termination of Convenience" under Section 22.2 of the Agreement, and insisting that IQVIA is therefore liable to NGA for a $2,694,753 penalty in connection with that purported "Termination of Convenience."

65. IQVIA therefore now seeks a declaration that:

(a) IQVIA's decision to suspend Waves 3 to 6 of the Agreement is not a "Termination of Convenience";

(b) NGA is not entitled to impose a $2,694,753 penalty, or any other penalty, on IQVIA;

(c) NGA's 7/13/17 Invoice is null and void;

(d) IQVIA is not in breach of the Agreement, and;

15

(e) NGA has no right now to unilaterally terminate the Parties' Agreement or to cease providing Services thereunder on just 30 days' notice.

## COUNT TWO

### (BREACH OF CONTRACT)

66. IQVIA incorporates by reference Paragraphs 1 through 59 with the same force and effect as if set forth in full herein.

67. IQVIA and NGA are both parties to the Agreement which remains fully in force between the Parties thereto.

68. IQVIA has fully performed its obligations under the Agreement.

69. NGA has breached the Agreement by failing to provide the cooperation and assistance with the WorkDay Project required by Section 10.1 of the Agreement and by failing to competently and fully provide the Services required under the Agreement, as detailed herein.

70. As a result of NGA's breaches of the Agreement, IQVIA has been damaged in an amount to be determined at trial.

71. IQVIA is also entitled to recover its pre- and post-judgment interest herein, together with its attorneys' fees and costs.

## COUNT THREE

### (TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTIVE RELIEF, AND PERMANENT INJUNCTION)

72. IQVIA incorporates by reference paragraphs 1 through 59 with the same force and effect as if set forth in full herein.

73. NGA's threatened termination of Services to IQVIA under the Agreement, on just 30 days' notice – a threat that NGA refuses to disavow – risks causing IQVIA and the 13,000+ IQVIA employees who receive payroll checks and direct deposits through NGA, irreparable injury.

74. To preserve the status quo until the trial of this case, IQVIA hereby requests that the Court issue a temporary restraining order, and thereafter a preliminary injunction, ordering NGA and its agents, servants, employees, and all persons acting under and in concert with them, to honor NGA's obligations under the Agreement to provide the Services, to process IQVIA's Change Orders, and not to unilaterally terminate the Agreement on just 30 days' notice.

75. IQVIA is willing to post a bond to secure NGA against any losses in the event the TRO and preliminary injunction are later determined to have been improvidently granted.

76. IQVIA also seeks a permanent injunction, after trial, imposing the same relief on a permanent basis.

WHEREFORE, Plaintiff demands judgment as follows:

(a) On the First Count, a declaration that:

(i) IQVIA's decision to suspend Waves 3 to 6 of the Agreement is not a "Termination of Convenience";

(ii) NGA is not entitled to a $2,694,753 penalty from IQVIA, nor any other penalty;

(iii) NGA's 7/13/17 Invoice is null and void;

(iv) IQVIA is not in breach of the Agreement; and

17

4849-9613-4242

(v) NGA has no right to unilaterally terminate the Parties' Agreement or to cease providing Services thereunder on just 30 days' notice;

(b) On the Second Count, damages in an amount to be determined at trial, together with pre- and post-judgment interest;

(c) On the Third Count, entry of a TRO, a preliminary injunction, and a permanent injunction, as set forth above;

(d) A trial by jury on all issues and claims so triable;

(e) An award of IQVIA's attorneys' fees and costs; and

(f) An award of such other further relief as the Court deems just and proper.

DATED: April 23rd, 2018

Respectfully submitted,

**BROOKS, PIERCE, McLENDON, HUMPHREY & LEONARD, LLP**

By: /s/ Charles F. Marshall
Charles F. Marshall
N.C. State Bar No. 23297
Charles E. Coble
N.C. State Bar No. 25342
P.O. Box 1800
Raleigh, NC 27602
Phone: (919) 839-0300
Fax: (919) 839-0304
cmarshall@brookspierce.com
ccoble@brookspierce.com

*ATTORNEYS FOR PLAINTIFF IQVIA, INC.*

18

Of Counsel:

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Kenneth W. Taber
Anne C. Lefever
Amanda H. Freyre
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York 10036
Phone: (212)858-1000
Fax: (212) 858-1500
kenneth.taber@pillsburylaw.com
anne.lefever@pillsburylaw.com
amanda.freyre@pillsburylaw.com